**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **RYAN GARNOW,** | CASE NO. 3:23 CV 743 |
| Plaintiff, | |
| v. | JUDGE JAMES R. KNEPP II |
| **SERGEANT ANDREW JONES, et al.,** | |
| Defendants. | **MEMORANDUM OPINION AND ORDER** |

### INTRODUCTION

Pending before the Court is Defendants' Motion for Summary Judgment (Doc. 46). Plaintiff opposed (Doc. 57), and Defendants replied (Doc. 59). Relatedly, the Parties filed cross Motions *in Limine* seeking exclusion of various opinions proffered by Defendants' expert witness, Jeffrey Eiser, and exclusion *in toto* of Plaintiff's expert witness, Roger Clark. (Docs. 47, 50). These Motions are also fully decisional. (Docs. 51, 53, 54, 55). For the reasons set forth below, the Court grants in part Defendants' Motion *in Limine*, grants Defendants' Motion for Summary Judgment, and denies as moot Plaintiffs' Motion *in Limine*.[1]

---

1. Because the Court finds Defendants are entitled to summary judgment without consideration of the opinions of defense expert Eiser, Plaintiffs' Motion *in Limine* targeting such opinions is denied as moot.

**BACKGROUND**

Viewing the facts in the light most favorable to Plaintiff, the background of this case is as follows:[2]

On April 17, 2022, Defendant and Marion Police Officer Nick Geurkink responded to reports of an intoxicated man standing outside of a Speedway Gas Station. (Doc. 46-1, at 4). There, he found Plaintiff Ryan Garnow who, in Plaintiff's own words, was "heavily intoxicated," "belligerent," and "extremely drunk and obnoxious." (Doc. 57, at 11). [3] Officer Geurkink's body camera recorded Plaintiff's arrest (Defs' Ex. 2), as did that of Officer Rob Musser (Defs' Ex. 3), who responded to the scene after Officer Geurkink.

During his arrest, Plaintiff routinely exhibited poor behavior, including swearing at the responding officers and physically resisting their attempts to place him in handcuffs. (Defs' Ex. 2, at 0:55–1:45). Plaintiff continued to taunt the responding Officers as they attempted to place him in the back of Officer Geurkink's squad car. *Id.* at 4:00–5:15; *see* Doc. 57, at 11 (describing Plaintiff as "repeatedly insulting the Officers and using racial slurs"). After successfully placing Plaintiff into the squad car, responding medical personnel evaluated Plaintiff and determined, but for loosening his handcuffs, Plaintiff did not require further medical attention. (Defs' Ex. 2, at 14:15–16:30; Defs' Ex. 3, at 12:30-13:34). Officer Geurkink then transported Plaintiff to the Multi-County Correctional Center ("MCCC") for processing. (Doc. 46-2).

Upon their arrival at MCCC, surveillance camera footage (Defs' Ex. 5), and Officer Geurkink's body camera (Defs' Ex. 4) captured the relevant events. The sallyport camera shows

---

2. By his own admission, Plaintiff retains no memory of the events giving rise to this lawsuit (Doc. 44, at 76–77), and thus offers no basis to contradict the accounts of the Officers involved in his detainment.

3. Throughout this opinion, the Court refers to the ECF document pagination, rather than the internal pagination assigned by the Parties.

Officer Geurkink arriving to MCCC with Plaintiff in tow around 2:49 AM. (Defs' Ex. 5, at 2:49:10–49:30). Officer Geurkink exited his vehicle and requested help from other officers stationed at MCCC, as Plaintiff continued to insult Officer Geurkink and yell incoherently. (Defs' Ex. 4, at 0:45–1:30). Officer Geurkink further requested a "spit mask," which is a transparent hood placed over an arrestee's head to prevent them from spitting on officers. *Id.* at 1:35–1:43. MCCC Officers Cassandra Versyn and Andrew Jones, the latter of whom is a Defendant in this case, then arrived at the sallyport. *Id.* at 4:00–4:12; Doc. 46, at 11. Officer Geurkink, speaking to Plaintiff through the door of the squad car, instructed Plaintiff to sit up and to stop kicking his seat. (Defs' Ex. 4, at 5:48–6:11). Officer Jones, having briefly left the sallyport, returned with MCCC Officers Devon Phillips and T. McCoy, both of whom are Defendants in this case. (Defs' Ex. 5, at 2:55:58–56:05); (Doc. 46, at 11).

After opening the squad car's rear passenger-side door in the presence of the other Officers, Officer Geurkink placed the spit mask over Plaintiff's head. (Defs' Ex. 4, at 6:18–6:23). Officer Geurkink then stepped away from the car, indicating to Officers Phillips, Jones, and McCoy, "that's all you." *Id.* at 6:26–6:30. After briefly attempting to communicate with Plaintiff, Officers Phillips and McCoy pulled Plaintiff out from the back seat. *Id.* at 7:27–7:45; Defs' Ex. 5, at 2:57:19–57:34. The same Officers, along with Officer Jones, then assisted Plaintiff to his feet and pulled up Plaintiff's pants, which had fallen around his ankles during his removal from the vehicle. (Defs' Ex. 4, at 7:45–8:10); (Defs. Ex. 5, at 2:57:35–57:58).

The Officers escorted Plaintiff inside the jail, wherein Officer Geurkink's body camera footage terminates. (Defs' Ex. 4, at 8:11–8:29). From this point forward, the sole footage presented to the Court stems from the surveillance footage covering MCCC's booking area and the cell in which Plaintiff was placed. *See* Defs' Ex. 5, at 2:58:20. This footage recorded no sound, and thus

the only account of the verbal interactions between the Officers and Plaintiff during this period comes from post-hoc Officer testimony. *See, e.g.*, Doc. 46, at 12–14 (citing Officer testimony); Doc. 57, at 17 (same).

After taking Plaintiff inside MCCC, the surveillance footage shows Officers McCoy and Phillips walking with Plaintiff while each maintains a grip on one of Plaintiff's arms. (Defs' Ex. 5, at 2:58:33–58:43). The Officers guided Plaintiff to an open cell "designed for intoxicated individuals." *Id.* at 2:58:43–58:47; Doc. 40, at 36–37. Therein, a scuffle ensued, and Plaintiff can be seen bending forward at the hips as Officers attempt to gain full control over him. (Defs' Ex. 5, at 2:58:47–58:49). Plaintiff then stepped onto a raised concrete platform designed to hold a mattress located on the right side of the cell. *Id.* at 2:58:49–58:51. At this time, Officer Jones, who had previously been following Officers McCoy and Phillips as they escorted Plaintiff to the cell, joined the attempt to gain full control over Plaintiff. *Id.*

The Officers pulled Plaintiff off the platform, at which time he initially remained on his feet. *Id.* at 2:58:51–58:53. After a brief struggle, during which Plaintiff remained bent forward at the hips, Plaintiff, as well as Officers McCoy and Phillips, fell to the ground. *Id.* at 2:58:53–58:55. In so doing, Plaintiff's head struck the frame of the door to the cell, which resulted in a significant laceration on his head. *Id.* Plaintiff immediately began to bleed onto the floor of the jail, at which point Officer Geurkink radioed for a medical transport. *Id.* at 2:58:58–59:09; Doc. 50, at 50–51.

The Parties dispute the nature of the circumstances surrounding Plaintiff's, Officer Phillips' and Officer McCoy's collective tumble to the ground.[4] Officer McCoy testified that, contrary to

---

4. The Court refers to the Parties' collective drop to the ground as a "tumble," "fall," and the like, as there appears to be no dispute the Officers did not intentionally employ a formal takedown maneuver. *See* Doc. 46, at 15; Doc. 57, at 8 (describing the Officers as "wrestl[ing]" with Plaintiff rather than engaging in a "takedown[] maneuver in an open area").

the typical practice of searching an arriving arrestee prior to placing them in the cell, the Officers decided to search Plaintiff inside his cell because "he was being noncompliant with [their] orders." (Doc. 42, at 33–34). Once inside the cell, the goal was to get Plaintiff to his knees such that the Officers would be able to conduct the requisite search. *Id.* at 56. However, the Officers maintain they never had the opportunity to employ a takedown maneuver or other method intended to get Plaintiff to his knees. *See* Doc. 41, at 34–35 (explaining the Officers did not employ a takedown maneuver and ended up on the ground after losing control of Plaintiff); Doc. 42, at 42.

Citing defense expert Jeffrey Eiser's testimony, Plaintiff states the Officers would have been "trained that the appropriate way for the officers to search a combative inmate like [Plaintiff] would be with a technique called 'wall grounding.'" (Doc. 57, at 18) (citing Doc. 50-1, at 9–10).[5] Rather than taking someone to their knees, a wall grounding involves "pushing [the arrestee] up against the wall and then gaining control of him. . . . You would then spread his legs out to where he was not unbalanced enough to fight off the wall. And then have one individual pat him down while the other . . . officers are holding him or grounding him against the wall." (Doc. 50-1, at 36–37). Further, Eiser opined the Officers would have been able to conduct a wall grounding inside the cell to which they took Plaintiff. *Id.* at 40. However, a floor grounding was "probably not" possible to conduct safely due to limited space, and a wall grounding was "a lot safer" while inside the cell. *Id.*

There is no dispute Plaintiff suffered significant injuries from striking his head on the door to the cell. After the incident, Plaintiff was hospitalized for multiple days and sought treatment for

---

5. Initially, it is unclear whether the cited portions of Eiser's testimony stand for this proposition. Eiser stated only that a wall grounding "would have been appropriate" in these circumstances. (Doc. 50-1, at 36). He did not specify whether a wall grounding was the *only* appropriate way to control Plaintiff in these circumstances or rather one appropriate option amongst many.

a traumatic brain injury. (Doc. 44, at 79, 89). Plaintiff requires regular assistance from family and friends for routine living tasks and has moved back in with his mother. *Id.* at 100–05. Finally, Plaintiff continues to suffer from significant memory issues, rendering him unable to take medication and schedule appointments with his doctors absent assistance from others. *Id.*

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any factual matter in dispute; the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

**DISCUSSION**

Plaintiff's operative Complaint first asserts numerous claims for relief against Officers McCoy, Phillips, and Jones (the "Officer Defendants") for their alleged use of excessive force. *See generally* Doc. 4. Specifically, Plaintiff brought claims pursuant to 42 U.S.C. § 1983 against these Officer Defendants "for excessive force in violation of the Eighth Amendment." *Id.* at 7 (capitalization altered). Plaintiff also presses state law claims for assault and battery against the Officer Defendants, which are accompanied by allegations that the Officers engaged in "reckless, wanton, and willful conduct." *Id.* at 8. Finally, Plaintiff sued the Marion County Sheriff's Office ("MCSO"), MCCC, and Sheriff Matt Bayles in his official capacity (the "County Defendants") claiming they maintained a "custom or policy" resulting in a "failure to train, supervise, or discipline officers regarding the avoidance of constitutional violations" and such custom or policy was "the moving force" behind the constitutional rights violations suffered by Plaintiff. *Id.* at 8–10; *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Defendants collectively moved for summary judgment on all claims. *See* Doc. 46. The Court analyzes each category of claim in turn.

<u>Individual Capacity Claims under § 1983</u>

Plaintiff brought his Eighth Amendment excessive force claim pursuant to § 1983 against the Officer Defendants "in their individual capacities as well as their capacity as an employee of the [MCCC] and/or . . . [MCSO]." (Doc. 4, at 7) (capitalization altered). Two doctrinal clarifications are necessary. First, a suit against a public official acting in their capacity as an officer of the state is merely another way of bringing "an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell*, 436 U.S. at 690); *see also Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) ("A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity."). To prevail on

a claim against the governmental entity, a plaintiff must demonstrate the entity deprived them of a federal right and such deprivation was caused by the entity's custom or policy. *See Foster v. Walsh*, 864 F.2d 416, 419 (6th Cir. 1988) (citing *Monell* 436 U.S. at 691–92). Thus, Plaintiff's official capacity claims against the Officer Defendants, as well as Sheriff Matt Bayles, are properly analyzed alongside his freestanding *Monell* claims against MCSO and MCCC.

Second, Plaintiff's decision to style his excessive force claim as arising under the Eighth Amendment was mistaken. "[T]he Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences," which Plaintiff decidedly was not. *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010). Rather, where, as here, an individual is arrested without a warrant, the Fourth Amendment continues to apply until the arrestee receives a probable cause hearing. *Id.* at 866 ("[B]ecause the Fourth Amendment controls the permissible *duration* of 'warrantless, post-arrest, pre-arraignment custody,' it must also 'apply to evaluate the *condition* of such custody.'") (quoting *Pierce v. Multnomah Cnty.*, 76 F.3d 1032, 1043 (9th Cir. 1996)). Defendants made a similar mistake, initially contending the Fourteenth Amendment governed Plaintiff's excessive force claim. *See* Doc. 46, at 16 ("Because Plaintiff's claims are made under the Eighth Amendment rather than the Fourteenth Amendment, summary judgment is warranted for that reason alone.").[6]

Despite his initial misstep, Plaintiff correctly cited the applicable Fourth Amendment standard in his substantive summary judgment briefing. *See, e.g.*, Doc. 57, at 26–27 (citing *Barnes v. Felix*, 605 U.S. 73 (2025)). While Defendants incorrectly pointed the Court towards the Fourteenth Amendment, the standards governing an excessive force claim brought under the

---

6. Defendants recognized this mistake in reply, stating "[u]pon further research, Defendants acknowledge that [Plaintiff] was likely not yet a pretrial detainee" as is required for the Fourteenth Amendment to govern an excessive force claim. (Doc. 59, at 13).

Fourth and Fourteenth Amendment are materially similar. *See Clay v. Emmi*, 797 F.3d 364, 269 (6th Cir. 2015) (describing the Supreme Court's ruling in *Kinglsey v. Hendrickson*, 576 U.S. 389 (2015) as establishing "that a pretrial detainee's excessive force claim brought under the Fourteenth Amendment's Due Process Clause is subject to the same objective standard as an excessive force claim brought under the Fourth Amendment"). For these reasons, the Court reaches the merits of Plaintiff's excessive force claims.

*Qualified Immunity*

The Officer Defendants claim entitlement to qualified immunity. *See* Doc. 46, at 8. Qualified immunity "spares officers from 'the time, expense and risk of money-damages actions' unless they violate clearly established constitutional rights." *Moore v. Oakland Cnty.*, 126 F.4th 1163, 1167 (6th Cir. 2025) (quoting *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 508 (6th Cir. 2012)). Unlike other affirmative defenses, a plaintiff bears the burden of overcoming qualified immunity once any defendant raises it. *See Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021). To do so, a plaintiff must demonstrate: (1) the officers violated the plaintiff's constitutional right; and (2) the violated right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court retains the discretion to address each element in either order. *Pearson v. Callahan*, 555 U.S. 223, 236, (2009).

"In identifying clearly established rights, the Supreme Court warns lower courts against defining them 'at a high level of generality.'" *Moore*, 126 F.4th at 1167 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). For all but the most obvious of constitutional violations, the plaintiff must "identify another case that places the constitutional question beyond debate." *Lee v. Russ*, 33 F.4th 860, 863 (6th Cir. 2022). While the facts of the identified case need not be identical to the case at hand, they must be meaningfully similar such that it would "bind a panel of [the

Sixth Circuit]." *Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022).[7] The material facts of the cited case "must be similar enough that [it] 'squarely governs'" the one before the Court. *Studdard v. Shelby Cnty.*, 934 F.3d 478, 481 (6th Cir. 2019) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)).

Under the Fourth Amendment test for excessive force, the "operative question is whether the force used was "'objectively reasonable" in light of the facts and circumstances confronting' the officer." *Mosier v. Evans*, 90 F.4th 541, 546 (6th Cir. 2024) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Thus, to overcome the assertion of qualified immunity within the context of his Fourth Amendment claim, Plaintiff must point to a case placing the question of whether the Officer Defendants' use of force was "objectively reasonable" beyond debate. *Id.* "'[S]pecificity is especially important' in Fourth Amendment excessive-force cases, where the constitutional boundaries are intensely fact-dependent." *Id.* (alteration in original) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam)).

Here, Plaintiff fails to meet his burden to identify a material issue of fact as to whether the Officer Defendants violated his clearly established constitutional rights. Plaintiff first relies on *Ortiz ex rel. Ortiz v. Kazimer*, in which the court denied qualified immunity to officers who employed force against a 16-year-old with Down Syndrome in an attempt to effectuate an arrest. 811 F.3d 848, 850–52 (6th Cir. 2016). In *Ortiz*, the officer in question, after admitting they observed the plaintiff surrendering, "pulled him from his mother's arms, and slammed him very hard into [a] vehicle like a football player making a tackle." *Id.* at 851 (internal quotations omitted). The officer then handcuffed the plaintiff and "used his body weight—205 pounds and twice [the

---

7. Because only published opinions bind future panels, Plaintiff may not rely on unpublished Circuit court or any district court opinions to establish the contours of the clearly established right allegedly violated by the Officer Defendants. *Bell*, 37 F.4th at 368.

plaintiff's weight]—to pin [the plaintiff] against the hot vehicle." *Id.* (internal quotations omitted). The officer then left the plaintiff so pinned for around fifteen minutes despite the plaintiff "not making any effort to resist" and "crying out in pain." *Id.* (internal quotations omitted).

The binding precedent the *Ortiz* court cited as examples of clear constitutionally excessive force demonstrate, by contrast to the facts presently before the Court, why Plaintiff falls short of his burden. One such clearly established Fourth Amendment violation occurs where an "an officer slams a non-violent and capitulating suspect against a vehicle." *Id.* at 852 (first citing *Miller v. Sanilac Cnty.*, 606 F.3d 240, 252–54 (6th Cir. 2010), and then citing *Phelps v. Coy*, 286 F.23d 295, 298 (6th Cir. 2002)). Next, an officer clearly employs excessive force "when he presses face-down a non-resisting and surrendered suspect longer than needed." *Id.* (citing *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004)). By *Ortiz*'s own terms, then, Plaintiff cannot establish a clear violation of his Fourth Amendment rights, as it is undisputed he continued to resist the Officer Defendants while inside the cell and that the Officer Defendants did not employ a takedown maneuver or otherwise intentionally "slam" Plaintiff to the ground. There is no genuine dispute as to Plaintiff's continued resistance inside the cell, meaning, as a matter of law, he had not "surrendered" to the Officer Defendants and they remained entitled to use force to restrain Plaintiff.[8] *See id.*; *Moore*, 126 F.4th at 1168 ("An officer may use force to restrain someone who actively resists by physically struggling with the police, threatening them, resisting handcuffs, or acting erratically.").

The next case Plaintiff relies on is also orthogonal to the facts presently before the Court. In *Martin v. City of Broadview Heights*, the Court denied the officers qualified immunity where

---

8. Plaintiff recognizes this unhelpful reality, stating "[c]oncededly, by running away the boy in *Ortiz* was not resisting at the level of [Plaintiff's] profane and out-of-control resistance." (Doc. 57, at 38).

they restrained a naked man roaming the streets and speaking nonsense by laying on top of him, delivering multiple "compliance body shots" to his side with a knee, striking him in the face with "hammer punches," and additionally striking him in the face, back, and ribs "at least five times." 712 F.3d 951, 954–55 (6th Cir. 2013). At least one of the officers maintained a grip on the arrestee's chin and neck area during the arrest. *Id.* at 955. Again, the precedents relied on by the *Martin* court bely any relevant similarity to the facts of this case. According to the *Martin* court, it was clearly established within the Sixth Circuit that an officer may not "apply[] pressure to the back of a prone suspect who no longer resists arrest and poses no flight risk." *Id.* at 961 (citing *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004)). Here, however, Plaintiff continued actively resisting the Officer Defendants inside the cell and no evidence suggests the Officers intentionally applied pressure on Plaintiff's back once on the ground. In *Martin*, the Court also identified as clearly established that "restraining the neck of an unarmed and emotionally disturbed man during the course of an arrest in his home" violates the arrestee's Fourth Amendment rights. *Id.* at 962 (citing *Griffith v. Coburn*, 473 F.3d 650, 659–60 (6th Cir. 2007)). Again, there is no evidence creating a material fact as to either of these clearly established rights under the Fourth Amendment. The Officers did not restrain Plaintiff by his neck, punch or strike him, or apply pressure to his back despite his continued resistance to the Officer Defendants' attempts to bring him under their control.

While it is true the Officer Defendants were required to "take into account [Plaintiff's] diminished capacity before using force to restrain him," the totality of circumstances nevertheless necessitate finding the Officer Defendants did not violate Plaintiff's clearly established constitutional rights. *Roell v. Hamilton Cnty.*, 870 F.3d 471, 482 (6th Cir. 2017); *see Palma v. Johns*, 27 F.4th 419, 432 (6th Cir. 2022). Plaintiff cites, but does not examine, the case of *Mosier*

*v. Evans*, which is on all fours with respect to the undisputed facts presently before the Court. 90 F.4th 541 (6th Cir. 2024); (Doc. 57, at 39). The *Mosier* court summarized the facts of the case, stating:

> Timmy Mosier spent the evening of March 2, 2019, drinking heavily and smoking marijuana. Deputy Joseph Evans arrested him on suspicion of public intoxication and took him to the Crockett County Jail.
>
> Mosier was handcuffed, with his hands behind his back, and dressed in overalls and socks when he arrived at the jail. Evans held the strap of Mosier's overalls and walked him toward the booking area. Mosier cursed at Evans and resisted his escort. Mosier turned to face Evans, rather than walking in the direction of the booking area. He walked forward a few steps but then forcefully pivoted away from Evans. Mosier stepped backwards, away from Evans and the booking area and swung his elbow upward toward Evans' arm in an apparent effort to break his grip. Evans, still holding Mosier's overall strap, grabbed it with both hands. Mosier braced himself as Evans pulled him forward by the strap. Evans then pulled the strap down and toward him, causing Mosier to twist down to the concrete floor, which he hit head-first.

90 F.4th at 545. As is readily apparent, Mosier's circumstances are practically identical to Plaintiff's. Officers arrested both men on charges of public intoxication, and both men persisted in cursing at and resisting the escorting officers. Upon their arrival to the jail, both men continued to resist officer control in similar manners, with Plaintiff stepping onto the raised platform in the cell and Mosier attempting to break the officer's grip. In fact, the force employed by the officer in *Mosier* rises beyond that employed by the Officer Defendants here, as the officer in *Mosier* intentionally pulled the strap of Mosier's overalls down and toward the officer, causing Mosier to hit the floor. *Id.* at 545–46.[9] Here, no evidence suggests the Officer Defendants intentionally employed such a takedown maneuver or otherwise intentionally pulled Plaintiff to the ground.

---

9. The Court does not credit Plaintiff's expert Clark's opinion that the Officer Defendants "pulled [Plaintiff] to the ground and caused his head to ram against a metal door jamb," as the surveillance footage lacks any indication the Officer Defendants so pulled Plaintiff. (Doc. 43-1, at 18). However, even if one of the Officer Defendants did engage in such a maneuver as Plaintiff claims the video shows (Doc. 57, at 30), the reasoning of *Mosier* would lead the Court to the same

Nevertheless, the *Mosier* Court found the officer entitled to qualified immunity. Importantly, the fact that Mosier "was actively resisting" at the time the officer applied the challenged force sufficed to distinguish the facts at hand from other clearly established Fourth Amendment violations. *See id.* at 547. So too here. Whatever the exact line between reasonable and unreasonable uses of force under the Fourth Amendment, Plaintiff's claimed right to be free from the force applied to him inside the cell, which indisputably did not involve an intentional takedown maneuver, was not clearly established at the time the Officer Defendants employed force against his person.

*Plaintiff's Expert Clark*

Nor does the testimony and report of Plaintiff's expert Roger Clark demand a different result. First, at least one opinion offered by Clark applicable to these individual capacity claims consists of an inadmissible legal conclusion that would be unhelpful to a jury. For example, after reciting the applicable Fourth Amendment excessive force standard, Clark states "[u]nder these circumstances, Sergant [sic] Phillips, Sergeant Jones and Officer McCoy acted with excessive force proximately causing [Plaintiff] to hit his head on the metal doorframe causing his injuries." (Doc. 43-1, at 17). But the question of whether the Officer Defendants employed "excessive force" is the very question charged to the jury in a Fourth Amendment excessive force case, rendering Clark's answer an impermissible legal conclusion that invades the province of the jury. *See Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) ("Although an expert's opinion may 'embrace[] an ultimate issue to be decided by the trier of fact[,]' the issue embraced must be a factual one." (alterations in original) (internal citation omitted) (quoting Fed. R. Evid. 704(a))).

---

conclusion: the Officer Defendants did not violate Plaintiff's clearly established Fourth Amendment rights.

For the same reasons, the Court disregards Clark's conclusory opinion that the "actions by [the Officer Defendants] were willful, wanton and reckless in nature proximately causing [Plaintiff] to hit his head on the metal doorframe leading to his substantial injuries." (Doc. 43-1, at 18).

Clark further opines the Officer Defendants "failed to reasonably consider" viable alternatives in handling Plaintiff, including sending him to the hospital due to his level of intoxication or using a wheeled restraining chair. *Id.* This testimony is irrelevant to the Fourth Amendment standard as applied to Plaintiff's particular excessive force claim, as the existence of reasonable alternatives *prior to entering the cell* would bear on whether the Officers acted negligently or failed to take reasonable steps to protect Plaintiff generally, not whether they affirmatively applied excessive force to his person in response to his continued resistance once inside the cell. *See* Fed. R. Civ. P. 401. At the very least, Clark's opinion regarding the existence of reasonable alternatives is insufficient to raise a material issue of fact as to whether the Officer Defendants violated Plaintiff's clearly established rights. *Roell*, 870 F.3d at 486 ("And so long as a reasonable officer could have believed that his conduct was justified, a plaintiff cannot avoid summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless.") (internal quotations omitted). Finally, the Court finds Clark's opinion that the Officer Defendants "violated national policy and training standards" unsupported and unreliable. The only national standards cited by Clark were the "Performance-Based Standards and Expected Practices for Adult Correctional Institutions," authored by the American Correctional Association. In their entirety, these standards (as produced to the Court) state:

> **Administration and Management**
> "GOAL Administer and Manage the facility in a professional and
> reasonable manner, consistent with statutory requirements.

"1A - **Performance Standard: Facility Administration**

"The facility is administrate [sic] red efficiently and responsibly. Performance is based on goals, objectives, and standard operating procedures and a system of regular review." (Page 1.)

The Multi-County Correctional Center administration and staff failed in their required duty to meet the most basic standard of care as expressed by the *Performance-Based Standards and Expected Practices for Adult Local Detention Facilities*, The American Correctional Association (ACA), Fifth Edition, as follows:

**"1 Safety**

"Goal: Provide a safe work environment for industries, staff, volunteers contractors *and inmates*. (Emphasis added.)

**"1A - PERFORMANCE STANDARD: PROTECTION FROM INJURY AND ILLNESS**

"staff, volunteers contractors and inmates. are protected from injury and illness in the workplace." (Page 1)

(Doc. 43-1, at 18–19). These "standards" and the conclusions drawn by Clark therefrom are so vague and indeterminate as to be essentially worthless in attempting to determine whether, at the requisite low level of generality, the Officer Defendants violated Plaintiff's constitutional rights, let alone a clearly established one. *See Moore*, 126 F.4th at 1167. Rather, these opinions and the standards they apply offer little more than high level abstractions. Independently, the Court finds little difficulty in determining this opinion of Clark's is inadmissible on unreliability grounds. *See* Fed. R. Civ. P. 702(c); *see also* Doc. 43, at 12–13 (admitting Clark "did not review the Ohio minimum jail standards for full service jails" and "did not review the Multi-County Corrections policy and procedure manual" before producing his expert report); *Alvarado v. Oakland Cnty.*, 809 F. Supp. 2d 680, 690–91 (E.D. Mich. 2011) (allowing an expert to testify as to "nationally recognized police standards" specifically "governing the use of excessive force, as well as the specific [county's] excessive force guidelines to which" the officer was subject and which the expert reviewed). Here, because he failed to rely on clear national excessive force guidelines and

16

did not review the excessive force guidelines to which the Officer Defendants were subject, Clark's testimony on these topics is unreliable and inadmissible.

Accordingly, the Court grants Defendants' Motion for Summary Judgment with respect to the individual capacity claims against the Officer Defendants, and grants in part Defendants' Motion *in Limine*.

*Monell* Claims

Next, Defendants move for summary judgment on Plaintiff's *Monell* claims against Defendants MCCC, MCSO, and Sheriff Bayles (the "County Defendants"), with which Plaintiff's official capacity claims as to the Officer Defendants will stand or fall.[10] Defendants raise two primary grounds in support of their Motion. First, Defendants argue Plaintiff pursues these claims against the wrong parties, as Marion County and its subsidiary departments are not *sui juris* and therefore may not be sued under Ohio law. *See* Doc. 46, at 15; Ohio Rev. Code § 301.22; *Meade v. Lorain Cnty.*, 707 F. Supp. 3d 728, 735 (N.D. Ohio 2023). Second, Defendants maintain they prevail on the merits of Plaintiff's *Monell* claims because Plaintiff fails to identify evidence creating a triable issue of fact as to the presence an illegal policy or custom. *See* Doc. 46, at 18–19. To Defendants' first argument, district courts remain split regarding the impact of a county's *sui juris* status under state law on the availability of federal relief under § 1983. *See, e.g.*, *Swigart v. Erie Cnty.*, 2025 WL 3140261, at *3 (N.D. Ohio) (collecting cases). However, the Court need

---

10. Plaintiff also asserted a claim against Sheriff Bayles in his individual capacity in his operative Complaint, *see* Doc. 4, at 9, though it is unclear if Plaintiff pursues that claim at this stage, as his opposition to Defendants' Motion for Summary Judgment contains no mention of Bayles in any capacity. Regardless, the Court grants summary judgment as to Sheriff Bayles for any remaining claims asserted against him in his individual capacity, as the record is entirely devoid of any evidence suggesting he had a personal involvement in causing the alleged violation of Plaintiff's constitutional rights. *See Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016).

17

not wade into these murky waters, as the Court determines Defendants are entitled to summary judgment on Plaintiff's *Monell* claims on the merits.

Generally, a plaintiff may proceed under one of four theories in attempting to demonstrate the existence of a governmental entity's custom or policy violative of federal law. Specifically, a plaintiff may "look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). Here, Plaintiff proceeds under the first theory, as his argument centers around whether Ohio Administrative Code § 5120:1-8-03(B)(1)(a)–(b), which permits corrections officers to use "the amount of force necessary" in "subduing an inmate who refuses to obey a staff command or order," was an unlawful "moving force" behind Plaintiff's claimed constitutional rights violation. *See* Doc. 57, at 28–30.

As Plaintiff himself identifies, in "asserting a section 1983 claim on the basis of a municipal custom or policy [he] must 'identify the policy, connect the policy to the [County] itself and show that the particular injury was incurred because of the execution of that policy.'" *Graham ex rel. Est. of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) (alterations in original) (quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)). Plaintiff arguably fails to connect the identified policy to the County Defendants and certainly fails to produce evidence of a causal nexus between the challenged policy and any constitutional violation that occurred. First, Plaintiff does not make a clear attempt to "connect" the County Defendants with the enactment or adoption of Ohio Administrative Code § 5120:1-8-03(B)(1)(a). The administrative regulations Plaintiff challenges are promulgated and enforced by the state Director of Rehabilitation and Corrections, not Marion County or the County Defendants. *See* Ohio Admin.

18

Code § 5120.01; *see also id.* § 5120:1-7-01 (charging the Bureau of Adult Detention with "the investigation and supervision of county and municipal jails").

Additionally, Plaintiff fails to demonstrate the challenged policy caused the injury he claims.[11] To meet such a burden, Plaintiff must show there is "'a direct causal link' between the policy and the alleged constitutional violation such that the County's 'deliberate conduct' can be deemed the 'moving force' behind the violation." *Franklin v. Franklin Cnty.*, 115 F.4th 461, 471 (6th Cir. 2024) (quoting *Graham*, 358 F.3d at 383). Opportunity alone is not enough. Where an official policy merely provides an official with the opportunity to violate the plaintiff's federal rights, the policy is not, without more, a direct cause of the injury. *See id.* at 471. Here, § 5120:1-8-03(B)(1)(a) at most provided the Officer Defendants with the opportunity to violate Plaintiff's rights by permitting them to use force in response to his noncompliance with their orders. Plaintiff cites to no evidence supporting his conclusion that "[b]ut for the County's choice of allowing force to control or subdue a disobedient prisoner, [Plaintiff] would not have suffered a debilitating and permanent brain injury." (Doc. 57, at 30). Perhaps sensing this evidentiary void, Plaintiff settles on adopting the very "opportunity" argument foreclosed by *Franklin*. *See* Doc. 57, at 30 ("The adopted standard does not require correction officers to use excessive force. As applied, however, the green light was lit.").

No triable issue of material fact exists with respect to Plaintiff's *Monell* claims, and the Court accordingly grants Defendants' Motion for Summary Judgment with respect to Plaintiff's

---

11. Despite resolving Plaintiff's constitutional claim under § 1983 on qualified immunity grounds, it remains theoretically possible for Plaintiff to have created a triable issue of fact as to whether he suffered a violation of a constitutional right not clearly established by binding precedent. *See, e.g.*, *Grote v. Kenton Cnty.*, 85 F.4th 397, 414 (6th Cir. 2023). The Court does not reach this question, as Defendants prevail at this stage by demonstrating the absence of an issue of material fact with respect to causation.

*Monell* claims against the County Defendants and his official capacity claims against the Officer Defendants.

State Law Claims

The Court previously exercised supplemental jurisdiction over Plaintiff's state law claims. Supplemental jurisdiction permits this Court to exercise jurisdiction over state law claims where such claims form part of the same "case or controversy" as federal claims over which the Court exercises original "arising under" jurisdiction. *See* 28 U.S.C. §§ 1367(a), 1331; *Robert N. Clemens Tr. v. Morgan Stanley, DW, Inc.*, 485 F.3d 840, 853 (6th Cir. 2007). Where, as here, a court disposes of all a plaintiff's federal claims prior to trial, "the balance of considerations usually will point to dismissing the state law claims." *Stanley v. W. Mich. Univ.*, 105 F.4th 856, 867 (2024). Several factors bear on whether this presumption in favor of dismissing the state law claims is rebutted, "including judicial economy, convenience, fairness, and comity." *Williams v. Addison Cmty. Schs.*, 2026 WL 575854, at *3 (6th Cir. 2026) (citing *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010)).

Here, the Court finds the presumption rebutted. First, the parties developed a complete evidentiary record and fully briefed Plaintiff's remaining state law claims. Dismissing these claims and leaving him to re-file in state court would thus necessitate a "multiplicity of litigation" to resolve the same controversy surrounding the Officer Defendants' alleged use of unlawful force. *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). Similarly, as discussed further *infra*, the only remaining state law claims present an immunity question roughly analogous to that presented by the Officer Defendants' qualified immunity defense. Thus, as a matter of fairness and to fulfill the purposes of immunity regimes protecting public officers from the time, risk, and expense of defending against actions for money damages, *cf. Moore*, 126 F.4th at 1167,

the Court is inclined to exercise jurisdiction over Plaintiff's state law claims. In this instance, exercising jurisdiction to decide questions of state law, particularly that of whether Defendants are entitled to statutory immunity under Ohio law, can hardly be described as "needless." *Landefeld*, 994 F.2d at 1182. Finally, the Court finds exercising jurisdiction over Plaintiff's state law claims presents little, if any, risk of violating traditional principles of federal-state comity. Primarily, this is because the questions raised by Plaintiff's state law claims "are neither novel nor complex." *Williams*, 2026 WL 575854, at *4 (describing federal-state comity concerns as arising in a situation where exercising jurisdiction over the remaining state law claims involved "needlessly intruding into significant state matters, such as the interpretation in the first instance of unique provisions of the state's constitution"). Federal and Ohio courts alike routinely apply the immunity rules codified in Ohio Revised Code § 2744.03(A)(6). *See, e.g.*, *K.W. v. Canton City Sch. Dist.*, 2022 WL 3681790, at *4 (N.D. Ohio); *Ellis v. Timm*, 504 F. Supp. 3d 726, 741 (N.D. Ohio 2020); *Irvin v. City of Shaker Heights*, 809 F. Supp. 2d 719, 738 (N.D. Ohio 2011). Thus, the Court exercises its discretion to retain jurisdiction over Plaintiff's state law claims for battery and assault against the Officer Defendants and reaches the merits of those claims.

Turning to the merits, Plaintiff no longer maintains a "separate claim for willful, wanton, or reckless conduct," as Plaintiff's counsel "reviewed the discovery and determined" that claim was no longer tenable. (Doc. 57, at 8). Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's second claim for relief to the extent Plaintiff ever possessed an independent cause of action for such a claim.

Remaining, however, is Plaintiff's state law claims for assault and battery against the Officer Defendants under Ohio law. *See* Doc. 4, at 10–11 (Plaintiff's fourth claim for relief). The Officer Defendants also move for summary judgment on these claims, arguing the Court's

21

qualified immunity analysis dictates its analysis with respect to Ohio's state statutory immunity regime. *See* Doc. 46, at 25–26. While some courts have collapsed federal qualified immunity and Ohio statutory immunity analyses, particularly where the parties agree the standard to be applied in both contexts is identical, *see, e.g.*, *Besser v. Ady*, 2025 WL 873437, at *15 (N.D. Ohio), the Court finds the Sixth Circuit's reasoning regarding the potential divergence between the two standards instructive. *See Abdur-Rahim v. City of Columbus*, 825 F. App'x 284, 288 (6th Cir. 2020) ("Notably, Ohio statutory immunity 'does not appear to require analysis of whether the underlying right has been clearly established in precedent, as does qualified immunity.'") (quoting *Stewart v. City of Euclid*, 970 F.3d 667, 677 (6th Cir. 2020)). Thus, the Court conducts a renewed analysis of the Officer Defendants' conduct under § 2744.03(A)(6).

The Officer Defendants are entitled to statutory immunity against these claims so long as their conduct was not "manifestly outside the scope of [their] employment or official responsibilities" or "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6). Given this statutory immunity standard matches that raised by Plaintiff's now-abandoned second claim for relief, it is unclear whether Plaintiff intended to abandon the claim as such or, rather, waive any argument that the Officer Defendants acted willfully, wantonly, or recklessly for any purposes. However, Plaintiff offers substantive argument as to the recklessness of the Officer Defendants' conduct, and the Court therefore reaches the merits of the immunity question under § 2744.03(A)(6). *See* Doc. 57, at 35–36. Plaintiff does not argue the Officer Defendants acted manifestly outside the scope of their employment, meaning the Court must only determine whether Plaintiff succeeded in creating a genuine dispute of material fact as to whether the Officer Defendants acted recklessly under § 2744.03(A)(6). He did not.

Initially, the standard created by § 2744.03(A)(6) for stripping state employees of their statutory immunity is more demanding than that of the Fourth Amendment's "objective reasonableness" test for excessive force claims, as the former is more akin to the "deliberate indifference" standard under the Eighth's Amendment's prohibition on cruel and unusual punishment. *See Hopper v. Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (citing *Stefan v. Olson*, 497 F. App'x 568, 580–81 (6th Cir. 2012)). The Ohio Supreme Court defined "reckless" for purposes of § 2744.03(A)(6) as "the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. Massillon*, 983 N.E.2d 266, 273 (Ohio 2012). The Court finds no reasonable juror could determine the Officer Defendants acted recklessly under this definition.

First, there is no dispute that, during the walk to the cell and while inside it, Plaintiff continually resisted the Officer Defendants, including by ignoring their orders, shifting his weight by bending at the hips, and stepping onto the raised platform in the cell. Rather than directly attack the amount or severity of force employed by the Officer Defendants, Plaintiff instead offers a slew of alternative measures that, if taken prior to entering the cell, may have prevented the circumstances rendering the use of force necessary from arising. *See, e.g.*, Doc. 57, at 18–19 (identifying a wall grounding; floor grounding in the booking area; and the use of a restraint chair, pepper spray, or tasers as plausible alternatives). Even taken as true, the presence of such "reasonable alternatives" is insufficient to establish recklessness. Rather, recklessness requires one or more of the Officers to have "[known] his conduct would in all probability result in injury" to Plaintiff when they attempted to control him inside the cell, not just that other reasonable, perhaps even more reasonable, alternatives existed. *Caudill v. City of Columbus*, 97 N.E.3d 800, 808 (Ohio Ct. App. 2017).

Plaintiff makes no such showing, as, even construing the surveillance and undisputed officer testimony in a light most favorable to Plaintiff, he fails to point the Court to any evidence tending to demonstrate the Officer Defendants objectively disregarded a risk beyond that inherent to applying the force necessary to control a resisting arrestee inside of a cell. Cases determining a triable issue of fact existed as to an officer's recklessness under § 2744.03(A)(6) demonstrate the tenuous nature of Plaintiff's position. *See, e.g.*, *Folks v. Petit*, 676 F. App'x 567, 572 (6th Cir. 2017) (finding a triable issue of fact as to an officer's recklessness where the officer "forcibly pull[ed] a compliant, non-resisting suspect from his car and slamm[ed] him against it with enough force to cause facial, neck, and head contusions"); *Raimey v. City of Niles*, 77 F.4th 441, 450–451 (6th Cir. 2023) (finding a triable issue of fact as to an officer's recklessness where the officer fired his weapon into a moving car while the driver "was driving very slowly and braking to comply with [the officer's] orders" and the officer "was either not in the path of the vehicle or could easily have stepped away from the slowly braking car"); *Burgess v. Fischer*, 735 F.3d 462, 480 (6th Cir. 2013) (finding present a triable issue of fact as to the officers' recklessness where the officers "slammed to the ground" a "handcuffed, intoxicated, and physically compliant" arrestee). Plaintiff identifies no evidence on which a reasonable jury could rely in finding the Officer Defendants acted recklessly under this standard,[12] and the Court therefore grants Defendants' Motion for Summary Judgment as to Plaintiff's state law claims as the Officer Defendants are immune from those claims pursuant to Ohio Revised Code § 2744.03(A)(6).

**CONCLUSION**

For the foregoing reasons, good cause appearing, it is

---

12. The Court reiterates the stance expressed *supra* regarding the inadmissibility of Plaintiff's Expert Clark's conclusion the Officer Defendants acted in a "willful, wanton and reckless" manner. (Doc. 43-1, at 18).

24

ORDERED that Defendants' Motion *in Limine* (Doc. 47) be, and the same hereby is, GRANTED IN PART AND DENIED AS MOOT IN PART; and it is

FURTHER ORDERED that Defendants' Motion for Summary Judgment (Doc. 46), be and the same hereby is, GRANTED; and it is

FURTHER ORDERED that Plaintiff's Motion *in Limine* (Doc. 50), be and the same hereby is, DENIED AS MOOT.

 s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: March 26, 2026